UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE MOBILE PHONE ASSIGNED CALL NUMBER 617-352-9469 | No. 22-mj-6025-MPK |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, John Oliveira, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Police Officer with the Somerville Police Department and have been so employed since 1997.  In 2000, I was assigned to the Detective Bureau of the Somerville Police Department.  In June 2008, I was assigned to the FBI Boston Division's Violent Crimes Task Force ("VCTF"), which comprises law enforcement officers from the FBI, Massachusetts State Police ("MSP"), and other local police departments. I have been sworn in as a Special Deputy U.S. Marshal.  As a member of the VCTF, I am responsible for investigating kidnappings, murders, robberies, extortion, and other violent crimes. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2.      This affidavit is being submitted in support of an application for a warrant to search electronic equipment, specifically, a mobile phone assigned call number 617-352-9469 ("the Equipment" or "the Cell Phone") that is in the possession of law enforcement investigators, as described in Attachment A.  There is probable cause to believe that the equipment contains evidence, fruits, and instrumentalities of the crime of interfering with commerce by means of violence, in violation of 18 U.S.C. § 1951, as described in Attachment B.

3.      On December 16, 2021, this Court issued a complaint charging JOHN SCHURKO

("SCHURKO") with affecting commerce by robbery, in violation of 18 U.S.C. § 1951.  The

affidavit in support of the complaint (the "Complaint Affidavit" or "Comp. Aff.") describes a

robbery of the Harvard Market, which is located 229 Highland Avenue, Malden, MA, that took

place at approximately 8:00 p.m. on December 12, 2021 (the "Malden robbery").

       4.      The Complaint Affidavit includes, but is not limited to, the following general

description of the Malden robbery based on a report by the Malden Police Department ("Malden

PD"):

> At around 8:11 p.m. officers went to the Market in response to a report of an armed robbery.
> An officer spoke to the victim clerk who said that someone had robbed the store and left.
> The victim told the police, among other things, that a white male who was about 5'10" and
> was wearing a black jacket and a ski mask entered the store.  The robber pointed a gun at
> him and then went behind the counter and asked the victim to give him all the money. The
> victim gave the robber the money in the register and the robber asked the victim to open
> the three wooden boxes where money is also kept. The victim opened the boxes and gave
> the robber that money. The robber then asked the victim for the money in the safe and
> counted to three, telling the victim that if he did not open the safe the robber would shoot
> him. The victim told the robber he did not have access to the safe but would give him some
> money he had in his wallet. The victim knelt and begged the robber not to kill him. The
> robber went back around the counter.  The victim offered the robber money he had in his
> wallet but the robber said he did not want the victim's money. The robber put the money
> from the register and wooden boxes in his pocket and left the store.  The victim estimated
> that the robber took approximately $3,000.

Comp. Aff. ¶ 4.  On the morning of December 13, 2021, I spoke to the victim who told me, among

other things, that the robber was around 5'10" to 6' tall but that he couldn't be sure because he

was extremely nervous.  Comp. Aff. ¶ 6.  According to SCHURKO's Massachusetts CJIS criminal

history, SCHURKO is 6'01".

       5.      Later that morning I, along with VCTF members MSP Trooper Michael Haines and

Malden Detective Robert DiSalvatore, began canvassing the area for additional surveillance

video.  As described in Complaint Affidavit ¶ 7, we were able to locate security video from a

nearby school and two nearby residences that, among other things, showed the robber parking a

large, older model white SUV near to the Harvard Market before the robbery and returning to it after the robbery and leaving the area.  The vehicle appeared possibly to be a Chevrolet Denali or a Cadillac Escalade.

6.      I and other members of the VCTF believed that this robber could be the same robber who committed a robbery in Medford, MA in September 2021 (the "Medford robbery") and robberies of Market Basket stores in Woburn and Billerica in October 2021.  SCHURKO was and remains a suspect in those robberies.  Although the modus operandi of the two Market Basket robberies was somewhat different, in part because the victims of those robberies were behind glass enclosures, the Medford robbery was eerily similar to the Harvard Market robbery.  According to information provided by the Medford Police Department ("Medford PD"), the Medford robbery occurred on September 18, 2021, at approximately 10:00 p.m., at the West Medford Spa, located at 439 High Street in Medford.  According to the victim clerk ("Medford victim"), she was emptying trash when the robber entered the store, immediately approached her, drew a black handgun from his waist, and pointed it at her.  He directed the Medford victim to the rear of the cashier area and appeared to have knowledge of the store, asking for money from specific boxes and containers behind the register, as well as cash from the register drawer.  At one point the robber said, "Open the safe, or I'll shoot," and grabbed the Medford victim when she was unable to do so.  The robber took cash himself from one of the registers.  The robber directed the Medford victim to get on the floor as he left the store. The Medford victim said, among other things, that the robber was a white male and estimated him to be approximately 5'11" to 6'02" with a heavier build and to be in his late 50's.  The Medford victim suspected that the robber may have been a former customer as he seemed to know about features of the store that were unique, such as locations of receipts and other containers behind the counter.  From reviewing surveillance video

the Medford PD could see that the robber was wearing a blue New England Patriots baseball-style hat, a black sweatshirt or jacket with a white shirt underneath, blue jeans, and black sneakers with white soles.  He was also wearing dark, possibly black, gloves.  The surveillance video shows, among other things, that the robber was wearing what appeared to be a black neck gaiter. Witnesses and surveillance video provided further details of his appearance and attire.  Again, according to SCHURKO's Massachusetts CJIS criminal history, he is 6'01" and at least at one point he weighed 225 pounds.  As related later in this affidavit, SCHURKO's brother, Neil Schurko, recently told the FBI that approximately a year and a half ago SCHURKO stayed with him (Neil) for 21 days at 121 Riverside Avenue in Medford, MA, which, according to Google Maps, is approximately 1.5 miles from the West Medford Spa.  In addition, SCHURKO's CJIS criminal history lists his address as 22 Allston Street, Medford, MA, and he thus apparently resided at that address at some point.  According to Google Maps, this address is a walk of approximately 5 minutes from the West Medford Spa.  Thus, as the Medford victim suspected, SCHURKO may very well have been familiar with the Spa.

7.     As of December 12, 2021, the day of the Malden robbery, investigators believed SCHURKO was living at 110 Hill Street, Apt. 10, in Stoneham, with his girlfriend, Barbara Aylward.  Part of the basis for this belief was a report that I obtained from the Stoneham Police Department ("Stoneham PD") concerning a break-in that occurred in a neighboring apartment in that building.  The report indicated that on November 23, 2021, an officer responded to a neighboring apartment regarding a report of a possible breaking and entering offense.  The officer spoke with the reporting party, who was standing in the hallway and speaking with SCHURKO when the officer arrived.  The reporting party stated he had returned home and observed that the door to his apartment was ajar. When he looked into the apartment he saw his neighbor,

SCHURKO, walking out with a flashlight. SCHURKO said that he had heard something in the hallway and went to check on it, saw that the door was open, knocked, and, when he received no answer, went in to make sure his neighbor was okay.  The reporting party could not identify anything that was missing but could tell that somebody had been in his apartment looking through his belongings. The reporting party stated he did not want to press charges against SCHURKO because he was unsure if SCHURKO was helping or not. He also indicated he had to live next door to SCHURKO and it probably was not worth it for him to press charges.

8.     On December 12, 2021, investigators seeking additional evidence regarding SCHURKO contacted building management for 110 Hill Street and learned that SCHURKO was no longer living there.  Specifically, investigators learned that sometime after the Stoneham PD officer left the building on November 23, 2021, the reporting party realized that the flashlight he saw SCHURKO holding belonged to the reporting party.  The reporting party complained to building management and SCHURKO was required to leave the building because he was not on the lease.

9.     After receiving this additional information regarding the Stoneham incident we did not know where SCHURKO was living, but we thought that he might be staying in a local hotel or motel given that he recently had been kicked out of the Stoneham apartment. During the early morning and into the afternoon of December 14, 2021, VCTF members conducted multiple checks of hotel and motel parking lots in Woburn, Everett, Revere, Saugus, Somerville, Malden, and Medford in an effort to locate a vehicle consistent with the SUV used in the robbery.  As a result of these hotel checks, investigators eventually observed a white 2005 GMC Yukon Denali bearing MA registration 3FBH19 (the "Yukon") in the parking lot of the AC Hilton Hotel, which is located

at 95 Station Landing in Medford.  The Yukon is consistent in appearance with the white SUV seen in the surveillance video collected from the locations near the Malden robbery.

10.     Given that SCHURKO was a suspect in three other robberies that we were investigating, VCTF members made contact with hotel management and, among other things, asked whether SCHURKO was staying there.   Hotel personnel told the investigators that SCHURKO had been staying there since December 6, 2021, and that he was using a credit card to pay for his room.

11.     The Medford Police Department has access to the exterior surveillance cameras and associated surveillance video covering the public areas of Station Landing.  Members of the Medford PD checked the cameras for December 12, 2021, starting at 7:00 p.m.  Video shows that the Yukon was backed into one of the parking spots opposite the side entrance door to the hotel. At approximately 7:35 p.m. a white male wearing what appeared to be a black 3/4 zip pullover, a black neck gaiter pulled down around his neck area, blue jeans, black sneakers with white soles and out soles, and a white baseball cap walked from the hotel and entered the driver's side of the Yukon.  The clothing is consistent with that worn by the robber, except that the robber wore a blue bucket hat rather than a baseball cap and was wearing gloves.  In addition, the robber had a black neck gaiter covering most of his face while the neck gaiter on the man who entered the Yukon was pulled down around the man's neck. After the man entered the Yukon it travelled on Station Landing, turning left onto Earhart Landing. It then travelled through Wellington Circle onto Middlesex Avenue in Medford.  Middlesex Avenue in Medford becomes Highland Avenue when it crosses into Malden.  The Market is located on Highland Avenue in Malden.

12.     I have viewed the video of the man entering the Yukon as described above.  I am familiar with the appearance of SCHURKO and believe this man was SCHURKO.

13.     The members of the Malden PD continued to watch the video of the hotel parking lot and observed that the Yukon returned to the hotel parking lot at about 8:15 p.m. (A recent review of the video revealed that the time stamp on the video was actually approximately 8:16 p.m.)  The white male who exited the Yukon appeared to be wearing the same clothing as when he got into it earlier: a white baseball cap, blue jeans, a black ¾ zip pullover, and black sneakers with white soles and out soles.  Because the pullover was zipped up at this point one cannot tell whether he was still wearing a neck gaiter. Two additions were that, like the robber, he was now wearing black gloves.  Also like the robber, the man who got out of the car had an item or items consistent with cash protruding from his left rear pants pocket. (As to the robber, this is visible from surveillance video that depicts him walking out of the Market and the left, away from the location of the camera.)  The man who returned to the hotel walked toward the hotel and entered through the side door. This male can then be seen on video walking up the staircase that faces Station Landing, appearing to exit the stairwell onto the third floor, where SCHURKO's room was located.

14.     Again, I believe the man depicted in the hotel parking lot video is SCHURKO.  I am familiar with the area in which the hotel and the Market are located.  I know that one can drive from the hotel to the Market, or from the Market to the hotel, within approximately five minutes during periods of normal traffic.

15.     Investigators also viewed surveillance video from inside the hotel and observed numerous images of SCHURKO inside the hotel.

16.     In addition, I learned on December 15, 2021, that an FBI Special Agent, Kristin Koch, happened to have met with SCHURKO on an unrelated matter on December 8, 2021. SCHURKO was wearing, among other things, blue jeans and a black neck gaiter pulled up over

his nose when he came out of the hotel.  Special Agent Koch has viewed video of the Malden robber and is 95% sure that it is SCHURKO given that the robber appears to be wearing the same jeans SCHURKO was wearing on December 8, appears to be wearing the same neck gaiter, was walking in a manner consistent with the way Special Agent Koch has seen SCHURKO walk, and given that the portion of the face that was visible above the gaiter appears to be the same as the portion of the face Special Agent Kock could see when she saw SCHURKO on December 8. Special Agent Koch has also reviewed video of the man leaving and returning to the hotel parking lot in the Yukon and is certain that it is SCHURKO.

17.     Special Agent Kock also had email correspondence with SCHURKO at 617-352-9469 (the call number for the Cell Phone) between November 5, 2021 and December 15, 2021. Among other things, some of the communications corroborate and supplement our understanding of where SCHURKO was staying during certain periods of time: on the morning of November 12, 2021, SCHURKO told Special Agent Koch that agents could meet with him that afternoon at 110 Hill Street in Stoneham and could say at the security booth that they were going to see "10 Barbie [A]ylward"; on November 26, 2021, SCHURKO told Special Agent Koch, "I'm at my brothers I'm gonna be on the street I'm not on barbs lease and she got a letter saying if I am found on the property I will be escorted off the property"; on December 6, 2021, SCHURKO told Special Agent Koch that he was fighting with his brother and that he had spent the night sleeping in a friend's car; and on December 8 SCHURKO told Special Agent Koch that agents could meet him at 95 Station Landing, the AC Marriot in Medford, because Aylward had "sprung" to give him piece of mind, that is, had paid for a room for SCHURKO.

18.     SCHURKO checked out of the Hotel on December 15, 2021.  I and other members of law enforcement were conducting surveillance.  As SCHURKO approached the Yukon with a

grey duffel bag and a white trash bag, he was placed under arrest.  We thereafter executed a search warrant with respect to the Yukon and the duffel bag and trash bags, which were immediately adjacent to the Yukon when we arrested SCHURKO.  Among other things, we recovered three pairs of blue jeans, black gloves, two black neck gaiters, a distinctive black watch that appears consistent with a watch worn by the Medford robber, and a black Airsoft handgun that appears consistent with the weapon shown during the Medford and Malden robberies. We also recovered a number of items from SCHURO himself, including two pairs of black gloves, sneakers consistent with those worn by the robber during those robberies, the Cell Phone, and a total of $1,610 in U.S. currency, which was recovered from various pants and jacket pockets and from SCHURKO's wallet.  We did not recover the ¾ zip jacket, but that jacket has a unique logo on it, and we recovered a T-shirt with the same logo.  We believe the logo is that of a union for which Barbara Aylward works.

19.     On December 16, 2021, FBI Special Agent Ferrara Bryce spoke over the telephone to SCHURKO's brother, Neil Schurko ("Neil").  Neil told Special Agent Bryce, in substance and among other things, that he and SCHURKO had stayed with SCHURKO's girlfriend, Barbara Aylward, approximately three years earlier.  While they lived together, Neil cared for SCHURKO, including by taking him to doctors' appointments.  At some point Neil moved out of Aylward's apartment and began living at 121 Riverside Avenue in Medford.  Approximately a year and a half ago SCHURKO and Aylward had a fight and SCHURKO stayed with Neil for 21 days, after which SCHURKO moved back in with Aylward.  SCHURKO eventually was kicked out of Aylward's apartment and moved in with Neil until, about two weeks before Neil's conversation with Special Agent Bryce, Neil, who lived in low-income housing, kicked SCHURKO out.  SCHURKO called Neil on the night of Saturday, December 11, 2021 (the night before the Malden robbery) to retrieve

some items he had left at Neil's apartment. SCHURKO thereafter retrieved a black gym bag, a black-and-gray gym bag, a yellow laundry bag, and a paper bag from Neil's apartment that weekend.

20.     Neil also told Special Agent Bryce, in substance and among other things, that SHURKO had been using drugs, primarily heroin, for the past two years. SCHURKO told Neil about contact he said he had had with former FBI Special Agent Larry Travaglia and an FBI Special Agent named "Krista" (an obvious reference to Special Agent Kristin Koch). According to Neil, SCHURKO texted Neil on December 15, 2021 (the day he was arrested) and said he was going to meet with "Krista." SCHURKO told Neil that he had stopped using drugs for a couple of days.

21.     Neil told Special Agent Bryce that SCHURKO's phone number was 617-352-9469, the number for the Cell Phone/Equipment; that he had no knowledge of SCHURKO committing robberies; that he had not seen SCHURKO with a gun or with large amounts of cash; that SCHURKO was living in a hotel in Somerville; and that SCHURKO was driving a white SUV.

22.     On December 18, 2021, Special Agent Bryce spoke with Andrea Sullivan, who provided her phone number and address in Billerica, MA. Sullivan told Special Agent Bryce, in substance and among other things, that she met SCHURKO through a mutual friend about a year earlier. Sullivan said that she was intoxicated on the night of Saturday, December 11, 2021(the day before the Malden robbery), and that SCHURKO drove her home in her white-colored Yukon SUV. Sullivan said that the Yukon had been in SCHURKO's possession since then. Sullivan told Special Agent Bryce that SCHURKO had been kicked out of his residence and had received an advance on his credit card to pay for a hotel in Medford. Sullivan said she had visited SCHURKO at the hotel on Sunday, December 12, 2021 (the day of the Malden robbery), and Monday,

December 13, 2021.  Sullivan said that she knew SCHURKO's girlfriend, Barbara.  She said she had never seen SCHURKO with a gun or large amounts of cash and did not have knowledge of SCHURKO using drugs.

23.     Based on the foregoing, there is probable cause to believe that SCHURKO committed the Malden robbery on December 12, 2021. Part of the probable cause to believe that SCHURKO committed that Malden robbery includes evidence that SCHURKO used the Yukon to drive from the AC Hotel in Medford, where he was a registered guest, to a location near the Harvard Market, and then used the GMC Yukon to drive back to the AC Hotel after committing the robbery.  Surveillance video of the AC Hotel parking lot shows that SCHURKO got into the GMC Yukon and left the parking lot at approximately 7:30 p.m., and that he returned to the parking lot at approximately 8:16 p.m., a window of time that provided SCHURKO the opportunity to drive to the vicinity of the Malden robbery, perform some reconnaissance, commit the robbery, and return to the AC Hotel.  Part of the probable cause to believe SCHURKO committed the Malden robbery includes the fact that a search after SCHURKO's arrest of the Yukon and the bags SCHURKO had placed next to the Yukon revealed clothing consistent with some of the clothing worn by the Malden robber (as was some of the clothing SCHURKO was wearing); an Airsoft gun that, while not a firearm, appeared to be one and is consistent with the firearm used by the robber; and the fact that SCHURKO had on his person, in various pockets, $1,610 in cash.

24.     SCHURKO also had a cell phone on his person.  There is probable cause to believe this is the Cell Phone/Equipment. This is due in part to the fact that SCHURKO provided the call number for the Cell Phone to the FBI and communicated with Special Agent Koch by means of the Cell Phone.  This is partly because the call number for the Cell Phone is the number Neil provided to the FBI as the number for SCHURKO.  And this is partly because Verizon provided

information regarding the Cell Phone in partial response to a search warrant and the phone recovered from SCHURKO matches the description provided by Verizon: an LG G7 ThinQ Silver.[1]

_____

[1]According to Verizon records, the Cell Phone is subscribed to Barbara Aylward, SCHURKO's girlfriend who, according to one of SCHURKO's text messages to Special Agent Kock, "sprang" for SCHURKO's room at the AC Hotel, and therefore could be expected to have provided him with a phone.  There are no records showing that the Cell Phone connected to any cell tower at the time of the robbery itself, and it is possible that it was powered off during this period.  The records provided pursuant to a warrant, which required Verizon to provide certain records for the Cell Phone for the period between 7:00 p.m. EST and 9:00 p.m. EST on the day of the Malden robbery, showed only one phone call during this entire period of time, an outgoing call at a little after 8:18 p.m.  According to the time stamp on the video from the AC Hotel parking lot, this was after SCHURKO had returned to the parking lot and entered the Hotel.  According to FBI Special Agent Kevin Hoyland, who is a member of CAST and is an expert in, among other things, the manner in which cell phones connect to cell towers and the records maintained by cell phone service providers, the sector of the tower to which the Cell Phone connected is not one that one would have expected to provide coverage to the Hotel, and there is a different tower that is closer to the Hotel that one would have expected a cell phone making a call from the Hotel to have utilized.  Special Agent Hoyland performed a so-called "drive test" to attempt to determine, among other things, whether the Hotel is in the coverage area of the tower to which it connected in making the call at 8:18 p.m., but the gear he was utilizing for this purpose connected to only one of the three sectors on the tower (which in this case consists of three arrays of antennae that are on top of a three-story building).  The sector to which the Cell Phone connected is one of the two sectors to which Special Agent Hoyland's gear did not connect when he performed the drive test, and it is not clear why this happened.  In any event, while cell sites such as the one to which the Cell Phone connected generally comprise three sectors, each of which, roughly speaking, covers a pie-shaped, 120-degree area, a particular sector may actually provide coverage outside that pie-shaped area for any number of reasons, including but not limited to the reflection or refraction of radio signals.  The bottom line is that probable cause for the warrant being sought exists even if the phone was not in the AC Hotel when the call was made.  This affidavit establishes probable cause to believe that SCHURKO was the user of the Cell Phone during the relevant period, that he committed the Medford and Malden robberies, and that the Cell Phone contains the evidence being sought.  It is also worth noting that the number the Cell Phone called was 978-908-9303, which is the number Andrea Sullivan provided to Special Agent Bryce as her number.  Andrea Sullivan, again, said that she had a drink with SCHURKO at the Hotel on

25.     There also is probable cause to believe that SCHURKO committed the Medford robbery on September 12, 2021, including the fact that SCHURKO's build is consistent with the Medford robber; the fact that the modus operandi of the Medford robbery and the Malden robbery were very similar; the fact that the Airsoft gun recovered from the Yukon is consistent in appearance with the gun used in the Medford robbery; the fact that some of the clothing recovered from the Yukon and the defendant's person is consistent with some of the clothing worn by the Medford robber; and the fact that a distinctive black watch recovered from the Yukon is consistent with a watch worn by the Medford robber.

26.     Based on my training and experience, I know that people who have cell phones commonly carry their cell phones with them.  I know this to be true in particular of people who commit robberies.  In this case, we recovered a cell phone from SCHURKO when we arrested him, which, as set forth above, probable cause exists to believe is the Cell Phone.

27.     The Cell Phone is currently being stored by the FBI at its facility as described in Attachment A.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

28.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities.  These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based

_____

December 12, 2021 (the day of the Malden robbery), and this could well have been SCHURKO reaching out to Sullivan to arrange that meeting.

messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing

items; searching for information including information regarding travel and activities; arranging

for travel, accessing personal accounts including banking information; paying for items; and

creating and storing images and videos of their movements and activities.

29.     Based on my training, experience, and information provided by other law

enforcement officers, I know that many smartphones (which are included in Attachment B's

definition of "hardware") can now function essentially as small computers.  The Cell Phone is a

type of smartphone. Smartphones have capabilities that include serving as a wireless telephone,

digital camera, portable media player, GPS navigation device, sending and receiving text messages

and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on

devices of this type can uncover, among other things, evidence that reveals or suggests who

possessed or used the device.

30.     Based on my training, experience, and information provided by other law

enforcement officers, I know in particular that individuals who commit robberies often possess

smartphones and use them for the purposes described above.  For example, I know robbers often

use smartphones to locate targets for robberies; to determine routes of travel to and from the scenes

of robberies; to communicate via e-mail and/or through direct phone contact; to take videos or

photos that contain evidence of robberies, such as photos depicting large amounts of cash

consistent with cash stolen in robberies, photos depicting an individual wearing clothing consistent

with clothing worn during robberies, and photos depicting a weapon consistent in appearance with

a weapon used during robberies; and to conduct internet searches for media and law enforcement

reports regarding robberies the individual has committed.  I also know that smartphones can

contain information regarding the location of the phone at various times, including potentially at

the times that robberies were committed.

31.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.  In this case, the evidence shows that SCHURKO used the Cell Phone to communicate with Special Agent Koch and Neil by e-mail, and that the Cell Phone was used on the evening of December 12, 2021, shortly after the Malden robbery was committed, to call the number assigned to Andrea Sullivan, whose Yukon SUV had been used in the commission of the robbery.  Given that individuals who commit robberies often use smartphone for the other purposes set forth above, there also is probable cause to believe that the Cell Phone contains photos or videos depicting cash consistent with the proceeds of robberies, clothing consistent with clothing worn during robberies, and weapons used during robberies; searches for potential robbery targets and/or searches for media and/or law enforcement reports regarding the commission of particular robberies; information regarding the location of the phone at various times, including potentially at the times that robberies were committed.; and searches to locate potential targets for robberies; and/or searches to determine routes of travel to and from the scenes of robberies.

32.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might

not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.        Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.        Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

33.        Based on the information described above, I have probable cause to believe that John SCHURKO has committed violations of 18 U.S.C. § 1951.

34.        Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the equipment described in Attachment A.

Attested to by telephone this 17th day of February, 2022.

/s/ John Oliveira
_____
John Oliveira
Task Force Officer, FBI

Attested to me on by telephone on February 17, 2022.

_____
HON. M. PAGE KELLEY
Chief United States Magistrate Judge

**ATTACHMENT A**

***Description of Equipment to Be Searched***

The equipment (the "Cell Phone") to be searched consists of the following:

- One Verizon LG G7 ThinQ smartphone, assigned call number 617-352-9469 and seized on December 15, 2021, from JOHN SCHURKO.

The Cell Phone is located at the Federal Bureau of Investigation, 201 Maple Street, Chelsea, Massachusetts.

**ATTACHMENT B**

**Items to Be Seized**

I.       All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 1951, including those related to:

      A.       The following topics:

           1.       Records relating to searches for or information regarding potential robbery targets, including but not limited to Harvard Market, 229 Highland Avenue, Malden, MA, and West Medford Spa, 439 High Street, Medford, MA;

           2.       Communication via e-mail and/or through direct phone contact relating to or constituting evidence of such robberies;

           3.       Videos or photos depicting potential proceeds of such robberies, including videos or photos depicting large amounts of cash; videos depicting clothing consistent with clothing worn in such robberies; and videos or photos depicting weapons, including but not limited to firearms or weapons having the appearance of firearms, such as Airsoft guns;

           4.       Records relating to searches or other information regarding media or law enforcement reports regarding robberies, including but not limited to the robbery of the West Medford Spa and the Harvard Market; and

           5.       Records relating to the location of the Cell Phone at various times, including at and around the time of the robbery of the West Medford

Spa at approximately 10:00 p.m. on September 18, 2021, and/or the robbery of the Harvard Market at approximately 8:00 p.m. on December 12, 2021.

B.     The payment, receipt, transfer, or storage of money or other things of value by JOHN SCHURKO;

C.     The travel or whereabouts of JOHN SCHURKO between September 1, 2021 and December 15, 2021;

D.     The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

E.     Evidence of who used, owned, or controlled the Cell Phone;

F.     Evidence of malicious computer software that would allow others to control the Cell Phone, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

G.     Evidence of the attachment of other hardware or storage media;

H.     Evidence of counter-forensic programs and associated data that are designed to eliminate data;

I.     Evidence of the times the Cell Phone was used between September 1, 2021 and December 15, 2021;

J.     Passwords, encryption keys, and other access devices that may be necessary to access the Cell Phone; and

K.     Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media.

II.      Serial numbers and any electronic identifiers that serve to identify the Cell Phone

### DEFINITIONS

For the purpose of this warrant:

A.      "Equipment" means any hardware, software, storage media, and data.

B.      "Cell Phone" means the smartphone identified in Attachment A.

C.      "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

D.      "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

E.      "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

F.      "Data" means all information stored on storage media of any form in any storage format and for any purpose.

G.   "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**Return of Seized Equipment**

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.